UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:CR-19-09 |
| | : | |
| v. | : | |
| | : | (JUDGE MANNION) |
| BRUCE EVANS, SR., and | : | |
| BRUCE EVANS, JR., | : | |
| Defendants | : | |

## S U P E R S E D I N G   I N D I C T M E N T

*FILED WILLIAMSPORT*
*MAY 28 2020*
*PER*
*DEPUTY CLERK*

### Introduction

At times material to this Superseding Indictment:

1.  The defendant, Bruce EVANS, SR. (EVANS SR.), resided in Greenfield Township, Pennsylvania.

2.  Defendant EVANS SR. has been one of the three Greenfield Township Supervisors since 1985.   In addition, he was one of five members of the Greenfield Township Sewer Authority Board, and the paid Manager of the Greenfield Township Sewer Authority (GTSA). Defendant EVANS SR. was an employee of both Greenfield Township and the GTSA, and did serve as the Township's "roadmaster". Defendant EVANS SR. currently is a Greenfield Township Supervisor.

1

Defendant EVANS SR. also serves as an assistant fire chief for the Greenfield Township Volunteer Fire Department.

3.      The Greenfield Township Board of Supervisors appointed defendant EVANS SR. to the GTSA Board in and around 1996. Defendant EVANS SR. shortly thereafter became the paid manager of the GTSA.

4.      Defendant EVANS SR. resigned from the GTSA Board in January, 2018, and the Board fired him and defendant EVANS JR. in February, 2018, from their paid positions.

5.      Defendant EVANS SR. also operated a business called B&R Sales which, among other things, repaired "grinder pumps". GTSA customers had to use grinder pumps to discharge wastewater into the GTSA sewer system.

6.      Defendant EVANS SR. also owned Finch Hill Water Company which provided drinking water to approximately 30 customers in the Township. Defendant EVANS SR. hired a contractor to operate his drinking water plant.

7.      Defendant EVANS SR. was not licensed by the Pennsylvania

2

Department of Environmental Protection (PADEP) as a wastewater or water treatment operator.

8.    Defendant EVANS SR. loaned out Township equipment to business entities without the consent of the Township and without charging recipients any rental fees.   One of the businesses included a race track where his son, defendant EVANS JR., regularly raced.   After defendant EVANS SR. resigned from the GTSA Board in January, 2018, the GTSA discovered a tanker truck owned by the GTSA on defendant EVANS SR.'s farm located on Arnold Road.

9.    The defendant, Bruce EVANS, JR. (EVANS JR.), resided in Greenfield Township, Pennsylvania.

10.    Defendant EVANS JR., the son of defendant EVANS SR., submitted a notarized application to PADEP for certification as a wastewater treatment plant operator on or about June 29, 2017. PADEP certified defendant EVANS JR. as a wastewater operator on or about August 17, 2017.   Defendant EVANS JR, was an employee of both Greenfield Township and the GTSA and performed different duties for each employer.

11.    Defendant EVANS SR. sent defendant EVANS JR.'s
wastewater operator training certification to PADEP on September 26,
2017.

## THE CLEAN WATER ACT

12.    The Clean Water Act (CWA), 33 U.S.C. § 1251, et seq., is the
Nation's comprehensive water pollution control statute.   The purpose
of the CWA is to restore and maintain the chemical, physical, and
biological integrity of the Nation's water.   In addition, the CWA was
enacted to prevent, reduce, and eliminate water pollution in the United
States and to conserve the waters of the United States for the protection
and propagation of fish and aquatic life and wildlife, recreational
purposes, and for the use of such waters for public drinking water,
agricultural, and industrial purposes.   33 U.S.C. § 1252(a).

13.    Title 33, United States Code, Section 1311 of the CWA,
prohibits the discharge of any pollutant by any person, except in
compliance with provisions of the CWA, including 33 U.S.C. § 1342.

14.    The CWA defines a "person" as an individual and a
corporation, 33 U.S.C. § 1362(5), and "any responsible corporate officer,"

4

33 U.S.C. § 1319(c)(6); "discharge of a pollutant" as any addition of any pollutant to navigable waters from any point source, 33 U.S.C. § 1362(12); "pollutant" as, among other things, solid waste, sewage, sewage sludge, chemical wastes, and industrial and agricultural waste discharged into water, 33 U.S.C. § 1362(6); "navigable waters" as waters of the United States, 33 U.S.C. § 1362(7); and "point source" as any discernible, confined, and discrete conveyance from which pollutants are discharged, including any pipe, ditch, channel, conduit, and discrete fissure, 33 U.S.C. § 1362(14).

15.    Title 33, United States Code, Section 1342 of the CWA authorizes the discharge of pollutants in compliance with a permit issued under the National Pollution Discharge Elimination System (NPDES) by the U.S. Environmental Protection Agency (EPA) or a federally authorized state agency, including the Pennsylvania Department of Environmental Protection (PADEP).

16.    NPDES permits authorize the discharge of pollutants into surface waters under specified conditions, and impose limits on the type and amount of pollutants that can be discharged into the waters of the

5

United States.   33 U.S.C. §§ 1311(a) and 1342.

17.   NPDES permits are specific to each treatment facility. They contain general operating and maintenance requirements and numerical pollution limitations.   The numerical limits are based on, among other things, the nature of the pollutants being treated, volume, treatment capacity, and the nature of the receiving waterway.   The NPDES permits require permit holders to participate in a self-monitoring program where they must collect samples prior to discharging treated wastewater into a receiving water, and to conduct analysis on the effluent (treated wastewater) discharged by the permitted facility.   These permits contain both daily and weekly monitoring requirements.   The permit program relies upon self-monitoring by the permittee.   Any failure with respect to self-monitoring affects the integrity of the regulatory program and can potentially affect human health and the environment.

## GTSA'S SEWAGE TREATMENT SYSTEM

18.    Greenfield Township is a township located in Lackawanna County, Pennsylvania.   The GTSA owns and operates a publicly owned treatment works (POTW) that consists of sewer lines, two pump stations and a treatment plant.   Greenfield Township appoints the members of the GTSA Board.

19.    The GTSA collection system has two sewer pump stations. One is located on State Route 106, near the intersection of State Route 106 and Shust Road.   The second is located on State Route 247, near the intersection of State Route 247 and Highpoint Street.   The State Route 106 pump station is located next to a veterinary clinic.   The pump stations were built in or about 1984.   As GTSA Manager, defendant EVANS SR. was the GTSA official responsible for overseeing operations of the Authority and reporting to the four other GTSA Board members and himself as a GTSA Board member.   The other members of the GTSA Board relied on information he provided to make decisions about operations of the wastewater treatment system, including how well the treatment plant and its related systems operated, hiring of

contractors to operate the GTSA plant, needed equipment repairs, staffing and maintenance, and compliance with federal and state environmental laws.

20.    The GTSA hired an engineering and environmental consulting firm to operate the treatment plant.   As Manager of the GTSA, defendant EVANS SR. was the GTSA official who dealt with the contractor on a day-to-day basis for approximately 26 years, and recommended renewal of the contract and any related cost increases to the GTSA Board.   Defendant EVANS SR. also dealt regularly with the Pennsylvania Department of Environmental Protection (PADEP).

## GTSA'S CLEAN WATER ACT PERMIT

21.    The GTSA wastewater treatment system was subject to the terms and conditions of Clean Water Act NPDES Permit No. PA 0061671 (Permit), effective May 1, 2009.   It was to expire April 30, 2014.   The GTSA initiated the process for renewal of the NPDES Permit on May 28, 2013, with the submittal of a permit renewal application signed by defendant EVANS SR. on behalf of the GTSA.

8

22.     Pursuant to Paragraph 3 of the NPDES Permit's
Introduction, page one, all terms and conditions of the May 1, 2009
NPDES Permit held by the GTSA remain fully in effect and enforceable
until PADEP takes final action on the renewal application.   The
PADEP has not approved issuance of a new NPDES Permit because of
various compliance issues related to operation of the GTSA treatment
facility.

23.     NPDES Permit No. PA 0061671 authorizes the GTSA to
discharge treated wastewater containing pollutants in limited
quantities and concentrations from its treatment facility located in
Greenfield Township, Lackawanna County, Pennsylvania.   The treated
wastewater, the effluent, is discharged via a pipe into an unnamed
stream which flows downstream out of Newton Lake, a natural lake,
and then past the GTSA treatment plant and into Dundaff Creek in
Watershed 4-F.

24.     Dundaff Creek flows into the Tunkhannock Creek, which
then flows into the Susquehanna River, a navigable-in-fact waterway of
the United States.   The unnamed tributary to Dundaff Creek, Dundaff

9

Creek, Tunkhannock Creek, and the Susquehanna River are all waters of the United States as defined by the Clean Water Act.

25.   GTSA's Permit contains numerical and narrative limitations on the type, quality and concentrations of pollutants permitted in discharged wastewater, and establishes compliance monitoring and reporting and other conditions which the GTSA has to meet to discharge pollutants into the unnamed tributary.   Permit requirements covered the treatment plant, sewer lines leading to the plant and the two pump stations which conveyed wastewater to the treatment plant.

26.   PADEP personnel were at the GTSA treatment plant or one of its pump stations at least 27 times in the years 2013-2017. Defendant EVANS SR. left the GTSA as a Board member and employee on or about January 2018.

27.   The treatment plant consists of a wet well where wastewater (influent) flows into on arrival at the plant, a splitter box that send influent to two Sequence Batch Reactors (SBRs), an Ultraviolet (UV) disinfection unit that replaced the original chlorine disinfection system, a sludge holding tank, and an outfall that discharges the treated

effluent to the unnamed tributary of Dundaff Creek.

28.    NPDES Permit No. PA 0061671, Part B, Section I.D.2,
required that GTSA at all times maintain in good working order, and
properly operate and maintain all facilities and systems of treatment
and control (and related appurtenances) which were installed and used
by the permittee to achieve compliance with the terms and conditions of
the GTSA Permit.   As Manager of the GTSA, defendant EVANS SR.
was responsible for ensuring GTSA's compliance with the NPDES
Permit and was the authorized recipient and signatory for most
communications to and from PADEP, including all notices of violations.

29.    NPDES Permit No. PA 0061671, Part C, Special Condition
Six, provides that collected screenings, slurries, sludges, and other
solids shall be handled and disposed of in compliance with 25 Pa. Code,
Chapters 75, and in a manner equivalent to the requirements indicated
in Chapters 271, 273, 275, 283, and 285 (related to permits and
requirements for landfilling, land application, incinerations, and
storage of sewage sludge), Federal Regulation 40 C.F.R. Part 257,
Pennsylvania Clean Streams Law, Pennsylvania Solid Waste

11

Management Act of 1980, and the Federal Clean Water Act and its amendments.

30.   NPDES Permit No. PA 0061671, Part A, Section C.1. provides, in relevant part, the discharger may not discharge floating materials, oil, grease, scum, foam, sheen and substance which produce color, taste turbidity or settle to form deposits in concentration or amounts sufficient to be, or creating danger of being, inimical to the water uses to be protected or to human, animal, plant or aquatic life.

31.   On April 24, 2013, the PADEP conducted a routine inspection of the GTSA waste treatment plant facility.   PADEP personnel encountered defendant EVANS SR. pumping the contents of the chlorine contact tank, including solids and sewage sludge, onto the ground and into the grass.   At that time, the chlorine contact tank provided disinfection of wastewater prior to its discharge into the unnamed tributary of Dundaff Creek.

32.   Pumping of the solids and sludge onto the ground violated the NPDES Permit, Part C, Special Condition Six, which outlines the requirements for the proper collection, handling and disposal of sludges

12

and other solids.

33.   On October 17, 2017, the PADEP conducted a routine inspection of the GTSA waste treatment plant facility and encountered defendant EVANS JR. who was operating the plant that day.   PADEP personnel observed a floating layer of sewage solids covering the entire surface of a Sequence Batch Reactor (SBR), part of the treatment process.   PADEP personnel also saw an accumulation of sewage solids in the ultraviolet disinfection unit that had replaced the chlorine contact tank.   During the inspection, accumulated sewage solids, including shredded paper or plastic, and Sphaerotilus natans (sewage fungus) were observed in the unnamed tributary immediately below the GTSA outfall pipe, which is the authorized location where treated wastewater is discharged into the unnamed tributary.   PADEP advised defendant EVANS JR. of these problems, but he took no action while the PADEP inspectors were at the facility.   These observed site conditions violated NPDES Permit No. PA 0061671, Part A, Section C.1 and the Permit's requirement to properly maintain the systems of treatment and control, NPDES Permit No. PA 0061671, Part B, Section

D.2.

34.   Following the inspection, defendant EVANS SR. sent PADEP a letter dated October 23, 2017 in which he stated that the outfall had been cleaned and restored to normal operating condition.

35.   On December 12, 2017, agents from the EPA and FBI executed a federal search warrant at the GTSA treatment plant and encountered defendants EVANS SR. and EVANS JR. upon arrival. Agents immediately observed that the GTSA wastewater treatment plant was discharging, partially treated, at best, sewage, solids and sludge.   A thick brown layer of scum, indicative of too much sludge in the treatment system, was observed overflowing the SBR reactor.   The sewage solids level in the SBR was elevated to the point that it was visibly discharging clumps of sewage solids to the UV disinfection unit's weir directly into the outfall.   As observed during PADEP's inspection in October, 2017, shredded paper or plastic, sewage solids, sludge and Sphaerotilus natans were observed in the unnamed tributary or on its banks.

36.   The conditions observed at the GTSA plant on December 12,

2017 violated the NPDES Permit No. PA 0061671, Part C, Special

Condition Six, which outlines the requirements for the proper collection,

handling and disposal of sludges and other solids, and Part B, Section

D.2, of the Permit requiring proper operation and maintenance.

## THE GRAND JURY CHARGES:

### COUNT 1

### 33 United States Code, § 1319(c)(2)(A)
### (Failure to Operate and Maintain in Violation of a CWA Permit)

37.    The factual allegations contained in paragraphs 1 through

36 of this Superseding Indictment are incorporated herein.

38.    On or about April 24, 2013, in the Middle District of

Pennsylvania, the defendant,

### BRUCE EVANS, SR.

knowingly violated and caused the violation of a permit condition of the

GTSA Permit issued under 33 U.S.C. § 1342, that is, the defendant

knowingly violated Permit conditions by failing to properly supervise,

operate and maintain the GTSA wastewater treatment facility by

intentionally pumping the contents of the chlorine contact tank,

including solids and sewage sludge, onto the ground and into the grass,

in violation of NPDES Permit No. PA 0061671, Part C, Special

Condition Six.

In violation of Title 33, United States Code, Sections 1311, 1342

and 1319(c)(2)(A), and Title 18 United States Code, Section 2.

**THE GRAND JURY FURTHER CHARGES:**

<u>**COUNT 2**</u>

**33 United States Code, § 1319(c)(2)(A)**
**(Failure to Operate and Maintain in Violation of a CWA Permit)**

39.    The factual allegations contained in paragraphs 1 through

36 of this Superseding Indictment are incorporated herein.

40.    On or about October 17, 2017, in the Middle District of

Pennsylvania, the defendants,

**BRUCE EVANS, SR.**
**and**
**BRUCE EVANS, JR.**

knowingly violated and caused the violation of a Permit condition of the

GTSA NPDES Permit issued under 33 U.S.C. § 1342, that is, the

defendants knowingly violated Permit conditions by failing to properly

16

supervise, operate and maintain the GTSA treatment facility by knowingly allowing waste materials, including paper and/or plastic, partially treated sewage and sewage solids, and Sphaerotilus natans (sewage fungus) to not be properly treated and to accumulate, resulting in the growth of Sphaerotilus natans below the outfall of the sewage treatment plant, in the unnamed tributary, in violation of NPDES Permit No. PA 0061671, Part A, Section C.1.

In violation of Title 33, United States Code, Sections 1311, 1342 and 1319(c)(2)(A), and Title 18 United States Code, Section 2.

## THE GRAND JURY FURTHER CHARGES:

### COUNT 3

### 33 United States Code, § 1319(c)(2)(A)
### (Failure to Operate and Maintain in Violation of a CWA Permit)

41.     The factual allegations contained in paragraphs 1 through 36 of this Superseding Indictment are incorporated herein.

42.     On or about October 17, 2017, in the Middle District of Pennsylvania, the defendants,

**BRUCE EVANS, SR.**
**and**

**BRUCE EVANS, JR.**

knowingly violated and caused the violation of a Permit condition of the
GTSA NPDES Permit issued under 33 U.S.C. § 1342, that is, the
defendants knowingly violated Permit conditions by failing to properly
supervise, operate and maintain the GTSA treatment facility by
knowingly allowing waste materials, including paper and/or plastic,
partially treated sewage and sewage solids, to not be properly treated
and to accumulate below the outfall of the sewage treatment plant in
the unnamed tributary, in violation of NPDES Permit No. PA 0061671,
Part B, Section D.2.

In violation of Title 33, United States Code, Sections 1311, 1342
and 1319(c)(2)(A), and Title 18 United States Code, Section 2.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 4

**33 United States Code, § 1319(c)(2)(A)**
**(Discharge in Violation of a CWA Permit)**

43.     The factual allegations contained in paragraphs 1 through 36 of this Superseding Indictment are incorporated herein.

44.     NPDES Permit No. PA 0061671, Part A.I sets forth numerical limits for certain pollutants and parameters.   During the execution of the federal search warrant on December 12, 2017, a sample of wastewater was taken at the location authorized by the Permit for compliance monitoring prior to discharge into the unnamed tributary. These limits and sample results include:

| POLLUTANT | LIMIT | SAMPLE RESULT |
|---|---|---|
| CBOD5 | IM - 50 mg/l | 170 mg/l |
| Total Suspended Solids | IM - 60 mg/l | 122 mg/l |

*IM equals Instantaneous Maximum.

45.   On or about December 12, 2017, in the Middle District of Pennsylvania, the defendants,

**BRUCE EVANS, SR.**
**and**
**BRUCE EVANS, JR.**

knowingly violated and caused the violation of a requirement of the GTSA Permit issued under 33 U.S.C. § 1342, that is, the defendants knowingly discharged pollutants, that is, CBOD 5 and Total Suspended Solids, in excess of the NPDES Permit limits for those pollutants, into the unnamed tributary to Dundaff Creek, in violation of NPDES Permit No. PA 0061671 Part A.I.

In violation of Title 33, United States Code, Sections 1311, 1342, and 1319(c)(2)(A), and Title 18 United States Code, Section 2.

**THE GRAND JURY FURTHER CHARGES:**

<u>**COUNT 5**</u>

**33 United States Code, § 1319(c)(2)(A)**
**(Discharge in Violation of a CWA Permit)**

46.   The factual allegations contained in paragraphs 1 through 36 of this Superseding Indictment are incorporated herein.

47.    NPDES Permit No. PA 0061671, Part A, Section I.A
authorized the GTSA to discharge up to a monthly maximum of 2000
colony-forming units of fecal coliform per 100 milliliters of wastewater
to the unnamed tributary for the months October 1st through April
30th.   The monthly permit limit during warmer weather, i.e., May 1st
through September 30th, was 200 colony-forming units per 100
milliliters of wastewater.   The permit required the GTSA to sample its
discharge weekly for fecal coliforms.   GTSA sent its samples to an
outside private laboratory for analysis.

48.    For the months of December, 2017, and January, 2018,
GTSA did not submit compliance monitoring data to PADEP for fecal
coliform or other pollutants despite the NPDES's Permit requirement
that it do so.   In a letter dated February 26, 2018, the GTSA sent a
letter to PADEP explaining that it lacked "reliable data" to submit.

49.    NPDES Permit No. PA 0061671, Part A, Section C.1.
provides, in relevant part, that GTSA could not discharge floating
materials, oil, grease, scum, foam, sheen and substance which produce
color, taste, turbidity or settle to form deposits in concentration or

amounts sufficient to be, or creating danger of being, inimical to the water uses to be protected or to human, animal, plant or aquatic life.

50.    On December 12, 2017, during the execution of the federal search warrant, a sample was taken of wastewater at the location specified in the Permit for compliance monitoring.   Laboratory analysis of that sample showed a fecal coliform level of 161,000 colony forming units per 100 milliliters of wastewater, a level far in excess of the numerical monthly limits contained in the GTSA NPDES Permit, in violation of Part A, Section C.1.

51.    On or about December 12, 2017, in the Middle District of Pennsylvania, the defendants,

**BRUCE EVANS, SR.**
**and**
**BRUCE EVANS, JR.**

knowingly violated and caused the violation of a condition of the GTSA Permit issued under 33 U.S.C. § 1342, that is, the defendants knowingly discharged a pollutant, that is, Fecal Coliform, into the unnamed tributary to Dundaff Creek, in violation of NPDES Permit No. PA 0061671, Part A, Section C.1.

In violation of Title 33, United States Code, Sections 1311, 1342 and 1319(c)(2)(A), and Title 18 United States Code, Section 2.

**THE GRAND JURY FURTHER CHARGES:**

### COUNT 6

**33 United States Code, § 1319(c)(4)**
**(False Statements in Violation of CWA)**

52.    The factual allegations contained in paragraphs 1 through 36 of this Superseding Indictment are incorporated herein.

53.    NPDES Permit No. PA 0061671, Part B, Section I. D. 1 required the GTSA to employ wastewater plant operators certified by the Commonwealth of Pennsylvania.

54.    On or about June 29, 2017, in the Middle District of Pennsylvania, the defendant,

**BRUCE EVANS, JR.**

knowingly caused false material statements, representations, and certifications to be made in applications, records, reports, plans, and other documents filed and required to be maintained under the CWA and the regulations promulgated thereunder, that is, the defendant

23

knowingly submitted and caused to be submitted an "Application for Certification to Operate Water or Wastewater Systems" to be submitted to the Pennsylvania Department of Environmental Protection, in pursuit of a Wastewater Systems Operator's License required by the GTSA NPDES Permit, that contained false information regarding his prior operator's experience, to wit: the defendant falsely reported part-time employment with the Greenfield Township Sewer Authority that involved regularly performing operator duties up to 15 hours per week from January 2010 to June 2017, when, in fact, he knew he had not been performing operator duties up to 15 hours per week from January 2010 to June 2017, and had only initiated an internship with the GTSA's contracted certified treatment plant operator in or about March 2017.

All in violation of Title 33, United States Code, Section 1319(c)(4), and Title 18, United States Code, Section 2.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 7

### 33 United States Code, § 1319(c)(2)(A)
### (Failure to Notify PADEP in Violation of CWA Permit)

55.   The factual allegations contained in paragraphs 1 through 36 of this Superseding Indictment are incorporated herein.

56.   The GTSA used two pump stations to assist wastewater in flowing to the treatment plant.   Defendant EVANS SR., rather than the licensed operator hired by the GTSA Board to operate the treatment plant, managed and operated the sewer lines and pump stations. Defendant EVANS SR. told PADEP personnel on multiple occasions that he was the "operator" of the pump stations.   Defendant EVANS SR. was not certified by PADEP to operate/manage the pump stations.

57.   In general terms, the State Route 106 pump station is located mostly underground in a concrete vault.   It is approximately 8 feet deep and 5 feet wide, and has a capacity of approximately 1,500 gallons.   A sewage collection line transports wastewater into the vault, and pumps then send the wastewater into a sewage main that transports the sewage to the GTSA wastewater treatment plant

approximately 2.2 miles away.

58.    The concrete vault is covered by a metal cover.   Associated piping is above ground, including a plastic pipe vent for sewer gases. The pump station also includes a telephonic alarm system which goes off when floats located in the vault at a predetermined level are triggered by a rise in wastewater.   The alarm is triggered to assist in preventing sewage overflows at the pump station.

59.    When the alarm was triggered, the system automatically dialed defendant EVANS SR.'s cell phone.   When the alarm was triggered and the phone system was not in operation, no one was notified.

60.    Records showed that the alarm system at the State Route 106 pump station dialed defendant EVANS SR.'s cell phone at least 221 times between August 4, 2014 and June 10, 2015.   From June 11, 2015 through April 30, 2016, the State Route pump station dialed defendant EVANS SR.'s cell phone 22 times.

61.    A        pipe is located in the concrete vault just above where the alarm floats are set.   This 6-inch pipe diverts wastewater

from the pump station and the GTSA sewer system.   This diversion means any sewage that flows through that pipe is not treated.

62.   Beginning in and about September, 2011, defendant EVANS SR., on behalf of the GTSA, contracted with a long-time friend who operated a business that hauled "gray water" generated at oil and gas drilling operations which had become prevalent in the area.   The friend needed a disposal location for "gray water", a mixture of wash water and toilet waste stored in tanks at oil and gas drilling operations.

63.   The agreement between the owner of the hauling business and defendant EVANS SR. was never put in writing.   The hauler paid six cents to the GTSA for each gallon of wastewater hauled to the GTSA for treatment.   The hauler used tanker trucks ranging in size from 2,500 to 4,700 gallons to transport the wastewater to the GTSA.

64.   A driver would write down the amount of gallons he dumped in each load on a piece of paper.   The driver would take the paper back to the business owner.   The business owner would then send a total amount of gallons disposed of each month along with payment to the

GTSA.   The owner sent checks periodically to the GTSA office to pay for disposal.

65.   The hauling company disposed of 2,398,250 gallons of "gray water" at the GTSA between September, 2011, and June 8, 2015.   The amount disposed of each year is as follows:

> September – December 2011 – 194,200 gallons
>
> 2012 – 550,950 gallons
>
> 2013 – 829,100 gallons
>
> 2014 – 533,500 gallons
>
> January – June 8, 2015 – 290,500 gallons

66.   Defendant EVANS SR. told the hauler where to bring his trucks for offloading.   At first, defendant EVANS SR. had the trucks go directly to the GTSA treatment plant to discharge their contents.

67.   Defendant EVANS SR. then changed the disposal location to the pump station located at State Route 247 and Highpoint Street near a restaurant for a short period of time.

68.   After receiving complaints from the owner of a nearby restaurant about odors, defendant EVANS SR. ultimately decided to

have truck drivers empty their trucks at the pump station located on State Route 106.   Defendant EVANS SR. had the State Route 106 pump station modified so that it could receive hauled-in waste in or about the summer 2012.   Dumping of hauled-in waste began at the State Route 106 pump station in or about July 2012.   Tanker trucks arrived almost every day, and up to five or six trucks arrived on some days.   These trucks were visible to neighbors.   This pump station is located about 2.2 miles from the wastewater treatment plant.

69.   The State Route 106 pump station vent pipe was altered to allow a truck driver to quickly connect a hose to the vent pipe.   In order to empty their trucks, drivers attached a hose from the truck to the quick connect fitting attached to the vent pipe located above ground. Drivers then pumped the contents of their trucks into the pump station via the vent pipe rather than opening the metal vault cover.   This process often took less than 10 minutes.   Drivers then unhooked the hose from the vent pipe and drove away.

70.   The State Route 106 pump station is located on the west side of State Route 106.   A marshy area is located on the east side of State

29

Route 106.   A stream flows through the marshy area and then past a business and residences located near the State Route 106 pump station. The stream then flows into Fall Brook which in turn flows into the Lackawanna River.

71.   Defendant EVANS SR., on behalf of the GTSA, did not inform the PADEP that it had been accepting the "gray water" in 2011 and 2012.   The PADEP learned that the GTSA was accepting such waste only when it received a complaint from an individual who lived near the State Route 106 pump station in April 2013 about odors and possible sewage overflows at that location and investigated.   Such complaints increased over time as the volume of "gray water" disposed of at the State Route 106 pump station increased.

72.   On at least one occasion, an individual observed what he believed to be sewage flowing into the stream described above in paragraph 70.

73.   On or about May 28, 2013, the GTSA applied to renew its CWA NPDES Permit.   The application was signed by defendant EVANS SR. on behalf of the GTSA and sent to the PADEP.   In the

application, defendant EVANS SR. told the PADEP that the GTSA had been and would continue to accept approximately 250,000 gallons annually of hauled-in wastewater from septic tanks that was accepted and treated by the GTSA.

74.    The GTSA accepted 550,950 gallons of hauled-in wastewater in 2012, more than twice the amount defendant EVANS SR. reported to the PADEP on the May 28, 2013 GTSA permit renewal application.

75.    The GTSA accepted 829,100 gallons of hauled-in wastewater in 2013, more than three times the amount defendant EVANS SR. reported to the PADEP on the May 28, 2013 GTSA permit renewal application.

76.    The GTSA accepted 533,500 gallons of hauled-in wastewater in 2014, more than twice the amount defendant EVANS SR. reported to the PADEP on the May 28, 2013 GTSA permit renewal application.

77.    The GTSA accepted 290,500 gallons of hauled-in wastewater between January 1 and June 8, 2015, more than the 250,000 gallon annual amount defendant EVANS SR. reported to the PADEP on the May 28, 2013 GTSA permit renewal application.

78.    The PADEP did not renew the GTSA's NPDES Permit because of compliance issues at the wastewater treatment plant, including its inability to adequately treat wastewater coming into the plant.    The NPDES Permit issued on May 1, 2009, remained in effect.

79.    Defendant EVANS SR. did not notify the PADEP in 2013, 2014, 2015 or in 2016 that the volume of hauled-in wastewater being treated by the GTSA had greatly exceeded the 250,000 gallon figure he provided to the PADEP in May, 2013.

80.    PADEP clean water regulations require a NPDES permittee to track and report on the amount of hauled in wastewater sent to a sewage treatment plant for treatment.

81.    The PADEP inspected the GTSA plant on March 6, 2014. The inspection report provided to defendant EVANS SR. noted that the GTSA should be reporting the amount of hauled in waste being treated at the GTSA plant and asked the GTSA to provide the amount of such waste for the past six months.    The GTSA never provided the requested information.

32

82.     When the GTSA submitted its monthly Discharge Monitoring Reports (DMR) to the PADEP, it included a Supplemental Form which had blocks for reporting the amount of hauled in waste sent to the GTSA each month for treatment.

83.     For the months of April through June, 2015, the GTSA did not indicate whether it had taken in any hauled-in waste and/or failed to answer the relevant questions.   The PADEP received those DMRs on May 29, 2015 (April, 2015), June 26, 2015 (May, 2015), and July 28, 2015) (June, 2015).

84.     Billing records from the hauler show that it disposed of 31,600 gallons of "gray water" at the State Route 106 pump station in April, 2015; 50,100 gallons in May, 2015, and 22,600 gallons through June 10, 2015.

85.     GTSA NPDES Permit No. PA 0061671, Part B, Section I.C.3 required the GTSA to notify the PADEP when it became aware that it had failed to submit any relevant facts or had submitted incorrect information in a permit application such as the one defendant EVANS SR. signed on May 28, 2013, on behalf of the GTSA.

33

86.   Defendant EVANS SR. failed to notify the PADEP that he had reported inaccurate amounts of wastewater hauled to the GTSA in 2012 on the 2013 permit application, and he failed to submit correct information based on the volume discharged in 2013, 2014, and for approximately the first half of 2015.

87.   On or about June 8, 2015, in the Middle District of Pennsylvania, the defendant,

**BRUCE EVANS SR.,**

did knowingly violate a condition of the GTSA's Clean Water Act NPDES Permit No. PA0064106, Part B, Section I.C.3, by failing to notify PADEP as soon as he was aware that the GTSA had submitted incorrect information in a permit application dated May 28, 2013, concerning the amount of gallons of "gray water" hauled to the GTSA wastewater treatment plant for treatment and failing to provide correct information in subsequent years.

All in violation of Title 33, United States Code Sections 1311, 1342 and 1319(c)(2), and Title 18, United States Code, Section 2.

34

**THE GRAND JURY FURTHER CHARGES:**

## COUNTS 8 through 15

### 33 United States Code, § 1319(c)(2)(A)
### (Bypassing the Treatment System Violation of a CWA Permit)

88.    The factual allegations contained in paragraphs 1 through 36 and paragraphs 56 through 86 of this Superseding Indictment are incorporated herein.

89.    GTSA NPDES Permit No. PA 0061671, Part A, Section II Definitions, defines a bypass to be the "intentional diversion of waste streams from any portion of a treatment facility."

90.    GTSA NPDES Permit No. PA 0061671, Part B, Section I.F.2 prohibits the bypassing of the GTSA wastewater treatment system except in cases where essential maintenance has to be performed or such bypassing is required to avoid loss of life, personal injury or "severe property damage" and there are no feasible alternatives to such bypassing.

91.    On June 10, 2015, PADEP personnel executed an administrative search warrant at the State Route 106 pump station.

35

92.    PADEP personnel discovered that the State Route 106 pump station had a six-inch pipe leading from the concrete vault that diverted wastewater from the GTSA wastewater treatment system.

93.    PADEP personnel introduced a mixture of water and green uranine dye into the pump station to see where wastewater that entered the bypass pipe would go.

94.    The dye test showed that the pipe went under State Route 106 to the marshy area on the other side of State Route 106.   The bypass pipe ended in the marshy area near a stream.   The end of the pipe was covered in silt.

95.    Untreated wastewater diverted via the bypass pipe emptied into the marshy area described above and was carried downstream past businesses and homes. The bypass outlet is located approximately 100 feet from a veterinary clinic, 140 feet from an apartment complex, and 400 feet from homes.

96.    The bypass pipe permitted wastewater to be diverted away from the GTSA wastewater treatment system.

97.    During the search, PADEP personnel noticed that solids had accumulated in the pipe near the point it left the concrete vault and headed toward State Route 106.   PADEP sampled that material. Analysis by a PADEP laboratory showed that the sample showed an elevated level of fecal coliforms of 230,000 colony-forming units per gram.

98.    Fecal coliforms are bacteria generated in the intestines of warm-blooded animals and are indicators of untreated or improperly treated wastewater.

99.    On May 20, 2015, June 10, 2015, March 16, 2016, and July 26, 2017, PADEP inspectors saw evidence that the volume of wastewater in the concrete vault had risen so high that it rose past the bypass pipe to the top of the State Route 106 pump station vault.   This evidence included observations of the high-water line at the top of the vault and underside of the metal vault cover, and sewage debris hanging above the bypass pipe.

100.  On May 20, 2015, November 28, 2016, and July 26, 2017, PADEP inspectors observed evidence that sewage had overflowed the

State Route 106 pump station vault.   This evidence included observation of sewage debris on the ground outside the pump station vault.

101.  On May 29, 2015, the high-water alarm system telephoned defendant EVANS SR.'s cell phone to alert him that the wastewater level had risen.   On that day, the hauler disposed of 3,500 gallons of "gray water" into State Route 106 pump station.

102.  On June 1, 2015, the high-water alarm system telephoned defendant EVANS SR.'s cell phone two times to alert him that the wastewater level had risen.   On that day, the hauler disposed of 6,200 gallons of "gray water" into State Route 106 pump station.

103.  On June 2, 2015, the high-water alarm system telephoned defendant EVANS SR.'s cell phone to alert him that the wastewater level had risen.   On that day, the hauler disposed of 1,800 gallons of "gray water" into State Route 106 pump station.

104.  On June 3, 2015, the high-water alarm system telephoned defendant EVANS SR.'s cell phone to alert him that the wastewater level had risen.   On that day, the hauler disposed of 3,000 gallons of

"gray water" into the State Route 106 pump station.

105.  On June 5, 2015, the high-water alarm system telephoned defendant EVANS SR.'s cell phone three times to alert him that the wastewater level had risen.   On that day, the hauler disposed of 6,700 gallons of "gray water" into the State Route 106 pump station, and a nearby neighbor contacted PADEP to report sewage odors.

106.   On June 8, 2015, the high-water alarm system telephoned defendant EVANS SR.'s cell phone to alert him that the wastewater level had risen.   On that day, the hauler disposed of 4,900 gallons of "gray water" into the State Route 106 pump station.

107.  The hauler ceased discharging into the State Route 106 pump station on or about June 10, 2015, the date of the PADEP administrative search.

108.  On or about the following dates, each date being a separate count, defendant EVANS SR. knowingly violated a condition of the GTSA Clean Water Act NPDES Permit No. PA 0064106, that is, by bypassing the GTSA wastewater treatment system in ways prohibited by Part B, Section I.F.2. of the Permit.

| COUNT | DATE OF BYPASS |
|-------|----------------|
| 8 | June 1, 2015 |
| 9 | June 2, 2015 |
| 10 | June 3, 2015 |
| 11 | June 5, 2015 |
| 12 | June 8, 2015 |
| 13 | March 16, 2016 |
| 14 | November 28, 2016 |
| 15 | July 26, 2017 |

All in violation of Title 33, United States Code, Sections 1311, 1342 and 1319(c)(2) and Title 18, United States Code, Section 2.

**THE GRAND JURY FURTHER CHARGES:**

## COUNTS 16 through 24

### 33 United States Code, § 1319(c)(2)(A)
### (Failure to Notify PADEP of Bypasses and Sewage Overflows in Violation of a CWA Permit)

109.  The factual allegations contained in paragraphs 1 through 36 and paragraphs 56 through 107 of this Superseding Indictment are incorporated herein.

110.  GTSA NPDES Permit No. PA 0061671, Part A, Section I.C.3.a. and b. required the GTSA to notify PADEP by phone and then in writing when it experienced incidents "causing or threatening pollution. . ."  This included such incidents as bypasses of the wastewater treatment system or sanitary sewer overflow from any part of its sewers, pump stations or wastewater treatment plant.

111.  A sanitary sewer overflow occurs when untreated wastewater is discharged from a sanitary sewer system prior to reaching the headworks of the wastewater treatment plant.

112.  PADEP personnel had, on multiple occasions, informed defendant EVANS SR. in person and in writing that the GTSA was

41

required to notify PADEP regarding sanitary sewer overflows.

113.  On June 10, 2015, PADEP discovered that the alarm system was disabled because the phone line had been cut.

114.  Bypasses and sanitary sewer overflows occurred on or about following dates at the State Route 106 pump station;   bypasses occurred on June 1, 2015, June 2, 2015, June 3, 2015, June 5, 2015, June 8, 2015, March 16, 2016, and July 26, 2017;   sanitary sewer overflows on May 20, 2015, November 28, 2016, and July 26, 2017.

115.  On or about the following dates, each date constituting a separate count, defendant BRUCE EVANS SR. knowingly violated a permit condition of the GTSA Clean Water Act NPDES Permit No. PA0064106, that is Part B, Section I.3.C.a. and b.by knowingly failing to notify the PADEP of a bypass or a sanitary sewer overflow.

| COUNT | VIOLATION | DATE |
|---|---|---|
| 16 | Bypass | June 1, 2015 |
| 17 | Bypass | June 2, 2015 |

| 18 | Bypass | June 3, 2015 |
| 19 | Bypass | June 5, 2015 |
| 20 | Bypass | June 8, 2015 |
| 21 | Bypass | March 16, 2016 |
| 22 | Bypass | July 26, 2017 |
| 23 | Sanitary Sewer Overflow | Nov. 28, 2016 |
| 24 | Sanitary Sewer Overflow | July 26, 2017 |

All in violation of Title 33, United States Code, Sections 1311, 1342 and 1319(c)(2), and Title 18, United States Code, Section 2.

## THE GRAND JURY FURTHER CHARGES:

### COUNTS 25 through 32

### 18 United States Code, § 1343
### (Wire Fraud)

116.  The factual allegations contained in paragraphs 1 through 36 of this Superseding Indictment are incorporated herein.

117.  As the Manager of the GTSA, defendant EVANS SR. held

administrative responsibilities for the GTSA including billing

customers, collection of sewer related bills, ordering supplies,

processing payroll, managing GTSA bills and invoices, and preparing

monthly "Manager's Reports" submitted to the GTSA Board.   In this

role, defendant EVANS SR. exercised control over financial accounts

related to the GTSA.

118.  During his tenure as Manager for the GTSA and as a GTSA

Board Member, defendant EVANS SR. fraudulently, improperly, and

unlawfully converted funds and property of the GTSA for his own

personal benefit and unlawful enrichment, and for the benefit and

unlawful enrichment of a family member.

119.  It was part of the scheme to defraud that defendant EVANS

SR. obtained for personal use a cell phone and electronic tablet with

AT&T cellular phone and internet service, and used GTSA funds to pay

for such services without authorization or approval of the GTSA Board

and unknown to Board members.

120.  It was part of the scheme to defraud that defendant EVANS

SR. routinely fueled his personal vehicle(s) and charged the cost of the

fuel to the GTSA-held charge account or GTSA credit card without authorization or approval of the GTSA Board and unknown to Board members.

121.  It was part of the scheme to defraud that defendant EVANS SR. fraudulently expended GTSA funds to pay for expenses related to the education and operator's licensure of his son, defendant EVANS JR., without authorization or approval of the GTSA Board and unknown to Board members.

122.  It was part of the scheme to defraud that EVANS SR. used employees and other resources of the GTSA, while the employees were being paid by the GTSA, to perform repair work on grinder pumps pulled for repair from other jurisdictions, namely, the Silver Lake Township Municipal Authority.   Thereafter, the Silver Lake Township Municipal Authority paid the defendant EVANS SR. for the pump repair work.   As a result, the defendant EVANS SR. was unlawfully enriched at the expense of the GTSA.

45

123.  From on or about February 1, 2014 and continuing through on or about December 31, 2017, in the Middle District of Pennsylvania, the defendant,

## BRUCE EVANS, SR.

having knowingly devised and intended to devise a material scheme to defraud the GTSA and to obtain money and property of the GTSA by means of materially false and fraudulent pretenses, representations and promises, did for the purpose of executing the scheme and artifice to defraud, and attempting to do so, knowingly cause to be transmitted via wire communications in interstate commerce the payment of the following fraudulent checks, among others:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 25 | April 20, 2017 | Check # 8965 issued in the amount of $88.85 payable to AT&T |
| 26 | June 15, 2017 | Check # 8996 issued in the amount of $90.85 payable to AT&T |
| 27 | April 12, 2017 | Check # 8963 issued in the amount of $310.40 payable to Lapera Oil Co. |

46

| | | |
|---|---|---|
| 28 | May 16, 2017 | Check # 8981 issued in the amount of $356.25 payable to Lapera Oil Co. |
| 29 | Feb. 11, 2017 | Check # 8920 issued in the amount of $328.00 payable to American Express ending 9-02004 |
| 30 | May 16, 2017 | Check # 8976 issued in the amount of $247.01 payable to American Express ending 9-02004 |
| 31 | Nov. 18, 2015 | Check # 8673 issued in the amount of $639.72 payable to George R. Everett |
| 32 | Jan. 14, 2016 | Check # 8696 issued in the amount of $354.01 payable to George R. Everett |

All in violation of Title 18, United States Code, § 1343.

**THE GRAND JURY FURTHER CHARGES**:

## COUNTS 33 through 36

### 18 United States Code, § 1702
### (Obstruction of Correspondence)

124.   The factual allegations contained in paragraphs 1 through 36, of this Superseding Indictment are incorporated herein.

125.   On or about September 10, 2015, the PADEP mailed a "Notice of Violation" to the GTSA c/o of defendant EVANS SR., regarding the June 10, 2015 PADEP administrative search warrant that occurred at the GTSA State Route 106 pump station.   Facts substantiating various NPDES permit violations observed and documented on June 10, 2015, including a recent sanitary sewage overflow, were included in the notice.

126.   PADEP requested a written response from the GTSA within 15 days of receipt of the September 10, 2015 "Notice of Violation," and specifically requested explanations for the causes of the described non-compliance, as well as the steps taken to insure future compliance with the GTSA NPDES permit.   A copy of a form necessary to report the

sanitary sewage overflow to the PADEP was included with the notice of violation to facilitate the required reporting.

127.   The September 10, 2015 PADEP "Notice of Violation" was sent by certified mail to the GTSA c/o defendant EVANS SR. and was signed for by defendant EVANS SR. on September 14, 2015 as confirmation of his receipt of same.

128.   By letter dated October 30, 2015, defendant EVANS SR. responded to the PADEP request.   The response submitted by defendant EVANS SR. was deficient in many respects.

129.   On December 1, 2015, the PADEP mailed a "Second Notice of Violation" to the GTSA c/o of defendant EVANS SR., which detailed the deficiencies in defendant EVANS SR.'s October 30, 2015 response; requested compliance with its initial request; and again included the September 10, 2015 "Notice of Violation."

130.   The PADEP wanted to make each member of the GTSA Board aware of the "Notice of Violation" and the incomplete response submitted by defendant EVANS SR.   The PADEP, therefore, sent each

individual Board member, including defendant EVANS SR., a copy of the "Second Notice of Violation" correspondence.

131.  The PADEP sent its December 1, 2015 "Second Notice of Violation" by certified mail individually to each GTSA board member at the GTSA address.

132.  The December 1, 2015 correspondence addressed to each GTSA Board member individually and sent by certified mail, was received by defendant EVANS SR. and signed for by defendant EVANS SR. confirming receipt by him on December 10, 2015.

133.  Defendant EVANS SR. thereafter secreted the mailings intended for each individual GTSA Board member, and obstructed delivery of said correspondence to each intended recipient.

134.   On or about the following dates, each date constituting a separate count, defendant BRUCE EVANS SR. did secrete and obstruct delivery of a letter individually addressed to the recipients identified below, and individually sent certified mail to each recipient at 111 Lakeview Avenue, Carbondale, Pennsylvania, which had been in a Post Office and an authorized depository for mail matter and in the custody

of a mail carrier before it had been delivered to the said individuals, to wit:

| Count | Intended Recipient | Date |
|---|---|---|
| 33 | Chair, GTSA Board | December 10, 2015 |
| 34 | Vice-Chair GTSA Board | December 10, 2015 |
| 35 | Treasurer GTSA Board | December 10, 2015 |
| 36 | Secretary GTSA Board | December 10, 2015 |

In violation of Title 18, United States Code, Section 1702.

A TRUE BILL

GRAND JURY FOREPERSON

DAVID J. FREED
UNITED STATES ATTORNEY

DATE: _5-28-20_     By: _Michelle Olshefski._

MICHELLE OLSHEFSKI
ASSISTANT U.S. ATTORNEY

_Martin Harrell_     _/s/ michelle olshefski_
MARTIN HARRELL
SPECIAL ASSISTANT
U.S. ATTORNEY

52